GEORGE W. WALLINGFORD *versus* BENJAMIN FISKE *&* *al.*

The rules prescribed in Mass. St. Feb. 2, 1819, for the sale of certain non-resident, unimproved lands by the sheriff for the payment of taxes thereon, while in force, must have been complied with, or the proceedings are void, and the deed of the sheriff passes no title to the purchaser.

Where the taxes upon such non-resident and unimproved lands were set to different persons, or upon different and distinct rights, numbers of lots, or divisions, the sheriff could not legally advertise and sell the whole of a township, including the several interests distinctly and separately taxed, or so much thereof as should be necessary to pay all the taxes; but each interest should be separately advertised and sold for the payment of the tax for which the same was liable, or the sale will be void.

And if a sale of such land be made for one entire sum, upon one bid, to pay the whole amount of the taxes thereon for five years, and the mode adopted in reference to the sale of the land for the payment of the taxes thereon for four of the five years was illegal, the sale is invalid, although it might have been legal, if made in the same manner to pay the taxes for the other year only. The sale must be valid for the whole, or the title entirely fails.

Such a deed is as ineffectual to give a seizin, as to convey a title.

As a widow is not entitled to dower in a tract of unimproved wild land, she is a competent witness for the heirs of her deceased husband in relation to such land.

AT the trial, before WHITMAN C. J. the demandant, to support his writ of entry, read a deed of the demanded premises from Frederick French to the late George W. Wallingford of Kennebunk, dated March 12, 1804, and proved that he was a son of the deceased, and produced conveyances from the other heirs of their shares. The land had never been improved, but remained in the original wild state. The tenants claimed under a tax title, by deed dated August 31, 1819.

After the evidence had all been introduced, the case was taken from the jury by consent of parties, and submitted to the decision of the Court, with an agreement, that the Court should enter such judgment, by nonsuit or default, as upon the evidence should be adjudged to be in conformity to law.

The view taken of the evidence by the Court appears in the opinion.

The case was elaborately argued by

*Rowe* and *D. T. Jewett,* for the demandant: — and by

*F. Allen* and *M. L. Appleton,* for the tenants.

In the argument for the demandant were cited *Hayden* v. *Foster,* 13 Pick. 492; *Williams* v. *Gray,* 3 Greenl. 207; *Little* v. *Megquier,* 2 Greenl. 176; 20 Pick. 418; 14 Pick. 224; 12 Pick. 534; *Williams* v. *Ingell,* 21 Pick. 288, and same parties, 2 Metc. 83; *Stone* v. *Clark,* 1 Metc. 378; *Dunn* v. *Hayes,* 8 Shepl. 76; *Moody* v. *Nichols,* 4 Shepl. 23; *Adams* v. *Frothingham,* 3 Mass. R. 360; *Davis* v. *Mason,* 4 Pick. 156.

For the tenants were cited *Colman* v. *Anderson,* 10 Mass. R. 105; *Ken. Pur.* v. *Laboree,* 2 Greenl. 75; *Crosby* v. *Parker,* 4 Mass. R. 110; *Stone* v. *Clark,* 1 Metc. 378; *Thayer* v. *Stearns,* 1 Pick. 482; *Slater* v. *Nason,* 15 Pick. 345; *Boston* v. *Otis,* 20 Pick. 38.

The opinion of the Court was drawn up by

TENNEY J. — Frederick French, who derived his title from the original proprietors of the south half of the township, which is now Milford, conveyed to George W. Wallingford, 825 acres thereof, by deed dated March 12, 1804. Wallingford died in 1824, leaving four children, his only heirs; the demandant being one, received conveyances from the others of their interest in the same land which was wild. The tenants claim under a sale of the whole township to them, made for the non-payment of county taxes, by George Watson, sheriff of the county of Hancock, on the 31st August, 1819, by virtue of a warrant to him from the treasurer of that county. The warrant purports upon its face to be issued by the authority of the statute of Massachusetts, passed February 2, 1819, entitled "an act to ascertain and establish a part of the west line of the county of Somerset, and for other purposes." That statute empowered the treasurers of the counties of Hancock and others to issue their warrants to the sheriffs of their respective counties, to collect the county taxes within each re-

spectively, which had been assessed upon the several towns, and unincorporated plantations, and other tracts of unimproved land, since the year 1812; but upon which townships, and other tracts of unimproved land, there was not at the settlement of the last valuation preceding, any person residing thereon, or assessors chosen, to whom the county treasurers could issue their warrants for the assessing thereof. All which sums were required by the act to be collected in the same manner as collectors or constables were directed to proceed in the collecting of taxes on non-resident proprietors of unimproved lands.

In 1813, a tax was apportioned to township No. 3, which has since been incorporated into the town of Milford, in these words: — "Township No. three, east side of Penobscot river, granted to B. Eppes, A. Forbes and I. Southgate, $2,19." For the year 1812 the taxes were apportioned as follows: — "Part of township No. 3, east side of Penobscot river, granted to B. Eppes, &c., ,17. Part of township No. 3, east side of Penobscot river, granted to I. Southgate, $2,39. Part of township No. 3, east side of Penobscot river, granted to A. Forbes, ,17." For the years 1814, 1815 and 1816, the apportionment is made in the same manner, the amount of taxes on the several parts differing each year.

The warrant from the treasurer to the sheriff does not specify the taxes upon each part, or for each year, but states only the gross amount of all the taxes upon the *township*, of those years, and directs the sheriff to proceed as is required by the act therein referred to. The sheriff made his return of that warrant, and after stating the mode of advertising, says, "I proceeded to sell at public vendue so much of the land in the said township No. three, as would be necessary to pay said taxes and charges, and the said township No. three was struck off to Abner Taylor, Benjamin Fiske and Wm. S. Bridge, they being the only bidders, for the sum of sixty-eight dollars and fifty-three cents."

By the statute of Massachusetts, passed March 16, 1785, § 7, when no person appears to discharge the taxes on unimprov-

ed lands of non-resident proprietors, to the collector thereof, he shall advertise the names of all such proprietors, whenever they are by him known, with the sum of the tax assessed on their lands respectively, and whenever they are not known, he shall in the same manner publish the sum of the taxes on the several rights, numbers of lots or divisions;" "and if no person shall appear thereupon to discharge the said taxes, and all necessary intervening charges, then the collector aforesaid shall proceed to sell at public auction to the highest bidder, (after waiting two hours from the time appointed for said sale,) so much only of said lands, as shall be sufficient to discharge said taxes, and the necessary intervening charges."

It is insisted by the demandant, that the proceedings on which the tenants found their title were so defective and unauthorized by law, that they have acquired no rights thereby.

The statute of Feb. 16, 1786, § 7, and that of Feb. 25, 1800, § 1 and 2, have no application to the present inquiry, as they relate to cases, where the inhabitants of any town, district, or plantation neglect to assess taxes required to be paid by such town, district, or plantation; whereas the statute of Feb. 2, 1819, applies to those townships and *unincorporated tracts of lands*, on which at the time of the next preceding valuation, there were no persons residing, or no assessors chosen. The mode of obtaining payment of the taxes under the two former statutes are entirely different from that prescribed under the latter. The statute of 1819 was intended to embrace those tracts of uncultivated land, where there had been no previous organization of any kind, whether they were townships as they were usually located, or other quantities of wild lands, of greater or less extent than ordinary townships.

The steps to be pursued in advertising and in making sale of such lands were specifically and minutely pointed out in the statute prescribing the manner in which collectors were to proceed in collecting taxes upon unimproved lands of non-resident proprietors. The rules there given could not be disregarded, without rendering void, the whole proceedings, so that a sale and a deed from the sheriff would pass no title to the

purchaser. The legislature were careful, that, so far as it could be done, each parcel of land should be exclusively holden for the tax with which it was charged; that no unnecessary inconvenience should arise from advertising and selling in gross different parcels of estate in which different interests might exist; that on a redemption of the title conveyed upon such a sale, each individual might obtain his own land by the payment of the tax thereon, and the expense arising from the sale, thereby avoiding the disputes which would grow out of claims for contribution, where one tract was burdened with the taxes upon itself and others also. In *Hayden* v. *Foster*, 13 Pick. 492, it was decided that where separate and distinct real estates belong to the same owner, they are to be considered as distinct subjects of taxation, and must be separately valued and assessed, and each estate is subject to a lien for the payment of that portion only of the owner's tax which shall be assessed upon such particular estate.

When the taxes are set to different persons, or upon different and distinct rights, numbers of lots, or divisions, there can be no propriety in advertising and selling so much of the whole township where they are situated, as is necessary for the payment of the sum of all the taxes upon all the distinct rights, numbers of lots, and divisions. The statute authorizes no such course, and is totally inconsistent therewith. Could a collector of taxes in a town, where there were many lots of unimproved lands, belonging to non-resident proprietors, be legally justified in advertising and selling so much of the whole of such lands as would be sufficient to pay the whole amount of all the taxes thereon, and the necessary expenses, unless payment thereof should be made before the time appointed for the sale? Each right, number of lot, or division, must be advertised; and so far as the charge upon each is not removed before the time for the sale, they are separately to be sold at public auction.

In a sale under a county treasurer's warrant, the sheriff could have no right to sell a whole township, where the tax was apportioned to separate and distinct parts, higher than that possessed by the collector of a town to make a general

sale of non-resident lands for the same purpose. The rule of the statute in one case is the rule in the other; and a departure therefrom is equally fatal in both.

The sale under which the tenants claim to hold the land in controversy cannot be upheld. The taxes were apportioned by the court of sessions for the County of Hancock, for four out of the five years, to separate and distinct parts of township No. three. The parts were of unequal value, as the tax upon one is much larger than those upon each of the other two. These parts were indicated by the names of the persons to whom they were severally granted. The township at the time, when the taxes were apportioned, had been still more minutely divided, and the deeds conveying different interests were upon record in the county of Hancock. The third and fourth quarters of the township, which have sometimes been denominated the south half thereof, were owned in common and undivided, by several proprietors, who as early as 1802, formed themselves into a proprietary, and continued to act as such, till most if not all their lands were divided and held in severalty, as appears by their records, which are a part of this case. The county treasurer made his warrant from records, showing, that the tax for the four years was apportioned not to the township, but to the parts. The same record could have been examined by the sheriff, who made the sale. There was a neglect of duty in one or the other, and a failure to proceed as the statute required.

As the sale was made for one entire sum and upon one offer only, to raise the money due for the taxes of five years, it cannot be effectual for that of 1813, even on the supposition, that the sale would have been legal, if made for the tax of that year, which was upon the whole township and not upon the parts. The sale was good or it was not; and as long as any part was illegal, it must radically affect the whole.

The sale and the deed being unauthorized and void, they could give no rights whatever to the tenants; they were as ineffectual to give a seizin, as they were to convey a title. There is no evidence in the case, which shows that the tenants

have had such an occupation, as to impair in any degree the title, which from the evidence was perfect in the demandant.

The case finds, that the land in controversy was wild; consequently, the widow of George W. Wallingford is not entitled to dower therein. *Conner* v. *Shepherd,* 15 Mass. R. 164. The objection made to her deposition on the ground of interest for this cause is without foundation.

It is denied by the tenants, that the demandant has a right to recover the whole of the tract of land, which is described in the writ. From the records of the proprietary of the south half of the township, it appears, that at a meeting on the 16th December, 1802, a plan of the front lots, made by one Turner, was adopted, and it was voted that the three eleventh parts of the lands lying east of the front lots, and 500 acres, should be set off to Frederick French, the grantor of the demandant's ancestor, on the south part of the land lying east of the front lots, and the north line of the premises to be parallel with the south line of the town. At this time it does not appear that any survey or plan of the lands east of the front lots had been made. At a meeting held February 8, 1805, it was voted to send Solomon Osgood, a surveyor, to examine a plan made by Philip F. Cowdin of their lands, and thereupon adjourned to the next day. At the adjourned meeting it was voted to accept the plan made by Cowdin, and also voted to Frederick French lots 8, 9, 23 and 34, as marked on Cowdin's plan, to rectify a mistake made by said Cowdin in setting off said French's land, which was to have been according to his deed, and that he and his heirs and assigns hold the same in severalty.

There can be no doubt of the intention of the proprietors in these several votes in relation to the lands to be held in severalty by French. The vote of Dec. 16, 1802, required nothing but the application of known rules to render it certain where the line should be, which should separate his lands from the residue of the tract. Three lines were fixed and certain; the fourth was to be parallel with the south line of the town, and so far therefrom as would embrace the three eleventh parts and the 500 acres. *Id certum est, quod cer-*

*tum reddi potest.* It was not the intention of the proprietary to bound French by the line on Cowdin's plan laid down as his north line. Although the plan was accepted, yet that line thereon was never adopted, for at the same meeting when the plan was accepted, it was known that that line was erroneously laid down, and the error was corrected by giving him all the lots lying next to that line on the north, excepting the one numbered 22. There never was any other line limiting the tract of French on the north, excepting the one, which included lots numbered 8, 9, 23 and 34. It was a different line from the one contemplated by the vote of Dec. 16, 1802, (which was never run,) but it was acquiesced in by the parties by the subsequent vote.

The conveyances to Baldwin and Wallingford, by French, were after the vote of 1802, and before that of 1805. There can be no controversy as to the location of the land described in the former deed. It is evidently the intention of the parties to the other, that the land conveyed was to be bounded on the south by Baldwin, on the east by the east line of the town, and on the north by the line, which should be run as the north line of French's land, and on the west by a line which would separate 825 acres. For the deed describes the land as bounded by the north line of French's land on the north, and on the west by a line parallel with the east line of the town, and so far distant therefrom as to give the quantity required. French so understood it, when he conveyed to Davenport in 1807. He had previously conveyed to Baldwin a tract lying 800 rods on the south line of the town and extending north 160 rods; and to Thomas French a tract lying directly west of that conveyed to Baldwin, and extending from the south line of the town, northerly 244 rods. The 825 acres sold to Wallingford, if made to extend to the north line of lot numbered thirty-four on Cowdin's plan, will be bounded on the west by a line which will strike the land of Baldwin at the distance of 333 rods from the east line of the land conveyed to Thomas French, which is the precise length of that line mentioned in the deed from French to Davenport; whereas if the land conveyed to

Wallingford was understood to be limited on the north by the south line of 34, it must have extended farther west, than a distance of 333 rods from Thomas French's east line, to contain the quantity of 825 acres. The fifth line of the description in the deed to Davenport is not inconsistent with this view. It is in these words, "thence east by the northerly line of land set off to said French, as marked on said plan, till it comes to land said French sold to George W. Wallingford." The grantor was careful to say, it was the northerly line of land set off to him *as marked on the plan*, and not the line of the land *actually* set off to him; for this line was regarded by the proprietors as an erroneous line from the time the plan was accepted by them, so far as it related to French's land. The land voted to French in 1802, was located as it was contemplated at that time, as near as it could be without discarding the plan which had been made upon an actual survey. According to the agreement of the parties

*The tenants must be defaulted.*